Corrected

# In the United States Court of Federal Claims

No. 21-2148
(Filed:  July 22, 2022)

```
*************************************
                                    *
GREAT NORTHERN PROPERTIES, L.P.,    *  Surface Mining Control and Reclamation Act;
              Plaintiff,            *  Motion to Dismiss
                                    *
       v.                           *
                                    *
THE UNITED STATES OF AMERICA,       *
                                    *
          Defendant.                *
                                    *
*************************************
```

## OPINION AND ORDER

**DAMICH**, Senior Judge

Plaintiff, Great Northern Properties, L.P. ("GNP"), brings this case alleging the taking of coal rights located in Powder River County, Montana.  ECF No. 1 ¶ 1.

## I.    Background

On August 3, 1977, Congress enacted the Surface Mining Control and Reclamation Act of 1977 ("SMCRA"), Pub. L. No. 95-87, 91 Stat. 445 (1977) (codified in 30 U.S.C. §§ 1201, *et seq.*) to provide "effective and reasonable regulation of surface coal mining operations by the States and by the Federal Government . . . [as] an appropriate and necessary means to minimize so far as practicable the adverse social, economic, and environmental effects of such mining operations."  *Id.* § 1201(e).

To implement SMCRA, SMCRA created the Office of Surface Mining Reclamation and Enforcement ("OSMRE") which is housed within the Department of the Interior; it also established a permitting requirement for surface coal mining.  30 U.S.C. §§ 1211, 1252(a), 1256(a).

Alluvial Valley Floor ("AVF") areas are protected from mining by SMCRA and similar state statutes, as mining there would adversely affect farming or other environmentally protected activities.  SMCRA explicitly provides that one of the government's goals in environmental consciousness is to protect AVFs.  30 U.S.C. § 1265(b)(10)(F).  SMCRA requires that a proposed surface coal mining operation not "interrupt, discontinue, or preclude farming on [AVFs] that are irrigated or naturally subirrigated" or "materially damage the quantity or quality of water in surface or underground water systems that supply these [AVFs]."  *Id.* § 1260(b)(5).

1

In addition, SMCRA sets national statutory minimum standards but permits the states to regulate surface mining in their respective jurisdictions upon approval by the Secretary of the Interior ("Secretary").  30 U.S.C. § 1253 ("Each State in which there are or may be conducted surface coal mining operations on non-Federal lands, and which wishes to assume exclusive jurisdiction over the regulation of surface coal mining . . . shall submit to the Secretary . . . a State program [for] carrying out the provisions of this chapter and meeting its purposes[.]"); *see also Penn. Fed. of Sportsman's Clubs, Inc. v. Hess*, 297 F.3d 310, 316 (3d Cir. 2002) ("The plain language of SMCRA evidences Congress's intent to give the states exclusive jurisdiction over the regulation of surface mining as long as the states enact laws and regulations that, at minimum, meet the minimum federal standards, with the federal standards serving only as the floor and not the ceiling for the state programs."); *Mont. Env't Info. Ctr. v. Opper*, No. 12-34, 2013 WL 485652, at 2 (D. Mont. Jan. 22, 2013) (citation omitted) (As long as states meet the minimum federal requirements, they may achieve primacy and their regulations "become operative for the regulation of surface coal mining," giving the state "exclusive jurisdiction over the regulation of coal mining within its borders.").  However, if a state chooses not to do so, OSMRE implements a federal program and is, among other things, directly responsible for permitting and enforcement duties in that state.  30 U.S.C. § 1254.

The State of Montana ("Montana") has opted to manage its own regulatory program. Montana's regulatory authority is the Division of Environmental Quality ("DEQ"). Montana implemented SMCRA's requirements through the Montana Strip and Underground Mine Reclamation Act ("MSUMRA"), Mont. Code Ann. §§ 82-4-201 through 82-4-254.  ECF No. 1 at 5.  In Montana, an AVF is determined through the procedures outlined in MSUMRA, § 82-4-227(3)(b)(i-iii).

In this case, GNP has an interest in the Otter Creek coal property.  A significant portion is owned by GNP, as the successor to the original railroad grant to Northern Pacific Railway.  ECF No. 1 at ¶ 8.  In 2002, Montana acquired a share of the Otter Creek coal property from the United States.  ECF No. 1 at ¶ 9.  Thus, Montana also owns a significant portion of the property.

In 2004, the Montana Department of Natural Resources and Conservation ("DNRC") reviewed the property and determined there were approximately 1.3 billion tons of recoverable coal reserves.  ECF No. 1 at ¶ 10.

In 2009, GNP entered into a coal lease with Ark Land Company, part of Arch Coal, Inc., which gave Arch Coal the right to mine GNP's coal reserves.  ECF No. 1 at ¶ 11.  This applied to approximately 396,431,839 tons of coal reserves.[1]  ECF No. 12 at 31.

On April 20, 2010, Montana entered into eight leases with Ark Land Company, giving Ark/Arch Coal the rights to mine the State's share of the Otter Creek coal reserves, resulting in

---

[1] The Plaintiff improperly pleaded their interest as 731 million tons of GNP coal reserves, when this is actually the total amount of Otter Creek coal reserves owned by both GNP and the Montana. GNP's total coal reserves are approximately 396,431,839 tons.  *See* ECF No. 1 at 4; No. 12 at 31 n. 7.

2

Arch Coal having the rights to mine the entire Otter Creek coal property.  ECF No. 1 at ¶¶ 13, 14.

On July 26, 2012, Otter Creek Coal, LLC, a subsidiary of Arch Coal, filed an application for a surface coal mining permit with the DEQ.  ECF No. 1 at 5.  This application concerned "Tract 2" of GNP's coal reserves, which Otter Creek Coal had divided into three Tracts for development.  ECF No. 1 at 5; ECF No. 12 at 42.  This application was deemed deficient by the DEQ most recently on March 16, 2015, when DEQ issued a letter of deficiency to Otter Creek Coal identifying information needed in order to complete their application.  ECF No. 1 at 6.

In November 2017, DEQ determined that any coal mining operations on the Otter Creek coal property in Tract 2 would interrupt, discontinue, or preclude farming on the AVF found there.  The most recent AVF determination was made in July 2020, where additional coal deposits in other areas of the property (including areas in Tract 1 and Tract 3) were precluded from being mined.  ECF No. 1 at 6.  The coal deposits identified by DEQ as unsuitable for mining contain approximately 310,633,420 tons of GNP-owned coal reserves, which according to GNP translates to a $1,310,872,932.00 loss.  ECF No. 1 at 6; No. 12 at 24, 27.

Thereafter, on November 8, 2021, GNP filed its one count complaint in this Court alleging:

> By statutorily requiring an alluvial valley floor determination, and the resulting designation that the Otter Creek Coal property was unsuitable for surface mining, the United States deprived GNP of all economically viable use of its interest in portions of its coal property.

> By preventing mining of the Otter Creek coal property, the United States affected a permanent taking of GNP's interest in the Otter Creek coal property for which GNP must be award and paid just compensation.

ECF No. 1 at 7.

In lieu of an answer, Defendant filed a motion to dismiss.  Defendant raises several reasons as to why GNP's complaint must be dismissed.  Specifically, Defendant argues that this Court lacks subject matter jurisdiction because: (1) GNP's claim is time barred; (2) GNP's claim is not ripe;[2] and/or (3) the claims arise from a state or state agency.  In the alternative, Defendant asserts that if this Court finds subject matter jurisdiction, GNP's complaint must be dismissed for failure to state a claim because: (1) Congress' passage of SMCRA did not effect a taking; (2) GNP's complaint fails to plead causation; (3) GNP's complaint fails to demonstrate a valid property interest that could be the subject of a taking; and (4) the allegations in GNP's complaint fail to state a clam for a taking applying the *Penn Central* test.

---

[2] In light of this opinion, the Court need not address the ripeness issue raised by Defendant.

In response, GNP argues that because of the imposition of AVF regulations required by the federal government, GNP is completely barred from mining substantial amounts of coal – which have a fair market value of over $1.3 billion.  Furthermore, the AVF regulations make it impossible for GNP to obtain the necessary permits to mine the Otter Creek property.  In sum, GNP contends that its suit seeks just compensation for the taking of its coal interest by the implementation of the required federal minimum standards for coal mining, specifically, the AVF regulations.

For the reasons set forth below, the Court dismisses GNP's complaint.

## II.    Discussion

### A.   Subject Matter Jurisdiction Under RCFC 12(b)(1)

Rule 12 of the Rules of the United States Court of Federal Claims ("RCFC") provides a procedure for judgment on the pleadings.

RCFC 12(b)(1) governs dismissal for lack of subject matter jurisdiction.  The Plaintiff "bears the burden of establishing the court's jurisdiction . . . by a preponderance of the evidence."  *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011).  In determining whether a court has subject matter jurisdiction, the Court takes "as true all undisputed facts asserted in the plaintiff's complaint and draw[s] all reasonable inferences in favor of the plaintiff."  *Id*.  If the Court determines that it lacks subject matter jurisdiction, at any time, it must dismiss the complaint under RCFC 12(h)(3).

### 1.   GNP's Takings Claim is Not Time Barred

 "Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues."  28 U.S.C. § 2501.  "The limitations period in 28 U.S.C. § 2501 is jurisdictional."  *Shoshone Indian Tribe of Wind River Rsrv. v. United States*, 672 F.3d 1021, 1029 (Fed. Cir. 2012) (citing *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 136–39 (2008)).

Here, Defendant argues that GNP's claim is time-barred because when the claim was filed on November 8, 2021, 44 years had passed since the enactment of SMCRA in 1977 (as well as the AVF provisions found within SMCRA).  Furthermore, according to the Defendant, because the Secretary of the Interior approved Montana's surface mining regulations in 1982, which included Montana's AVF limitations, the latest this case, as presented, could have been filed is 1988.

In contrast, GNP contends that the time of the claim's accrual is when "an expert agency makes its determination regarding existence and impact of an AVF."  ECF No. 12 at 12.  This, GNP argues, indicates that GNP's takings claim did not arise until November 2017, the time at which the DEQ made its AVF determination.  *Id*., *see Whitney Benefits, Inc. v. United States*, 926 F.2d 1169, 1171 (Fed. Cir. 1991) (a "regulatory statute" takings claim would accrue when an

"expert agency applied its judgment and field reconnaissance to evaluate the surface of the land."). Hence, purportedly, its claim is timely. The Court agrees.

The alleged action that precipitated this federal lawsuit occurred in November 2017. This is clearly within the six-year statute of limitations.

## 2. The Court Lacks Subject Matter Jurisdiction Over Claims Arising Under State Law

However, the Court of Federal Claims does not have subject matter jurisdiction over claims which arise against a state or after action taken by a state agency. *See* 28 U.S.C. § 1491(a)(1) ("The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States.").

It is well settled that "[t]his court does not have jurisdiction over any claims alleged against states, localities, state and local government entities, or state and local government officials and employees; jurisdiction only extends to suits against the United States itself." *Anderson v. United States*, 117 Fed. Cl. 330, 331 (2014). *See Wilson v. United States*, 404 F. App'x 499, 501 (Fed. Cir. 2010); *Wolffing v. United States*, 144 Fed. Cl. 626, 637 (2019); and *Brashear v. United States*, 776 F. App'x 679, 683 (Fed. Cir. 2019) (all of which find that the Court of Federal Claims lacked subject matter jurisdiction over claims arising under state statutes).

Here, GNP does not allege any federal involvement in the specific AVF determination. GNP's claim that they are precluded from mining is based on the AVF determination made by the Montana state agency (DEQ), operating under Montana state law (MSUMRA). Again, GNP acknowledges that "the State of Montana was not acting pursuant to a federal agency order in making its AVF determination." ECF No. 12 at 26. Thus, as this claim does not arise under any federal action or under any federal regulation, this Court lacks subject matter jurisdiction. The case must, therefore, be dismissed.

## B. Failure to State a Claim Upon Which Relief Can be Granted Under RCFC 12(b)(6)

The Court will also address Defendant's alternative argument as it is instructive for future cases. In the alternative, Defendant argues that, even if GNP's claim is not time barred, GNP's claim fails to state a claim upon which relief can be granted. ECF No. 8 at 19. To sufficiently plead a claim for relief and avoid dismissal pursuant to RCFC 12(b)(6), a complaint's factual allegations "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). That is, the plaintiff's claim must be plausible on its face. *Id*. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While a plaintiff is not required to include "detailed factual allegations" in order to survive a motion to

dismiss for failure to state a claim, he or she must supply more than conclusory allegations or a recitation of the elements of a cause of action. *Id*. (internal quotation omitted).

### 1. Congress's Passage of SMCRA Did Not Affect a Taking

Defendant argues that GNP's claim fails to identify federal action that affects its property interests. In response, GNP argues that it is rather SMCRA's statutory requirements surrounding AVF determinations that resulted in a designation that the Otter Creek Coal property is unsuitable for mining that deprived GNP of economic use of the land. ECF No. 1 at 7. GNP further clarifies that the mere enactment of SMCRA did not affect a taking, but asserts that the implementation of SMCRA regulations, requiring a non-discretionary AVF determination by the agency, either state or federal, constitutes a taking. ECF No. 12 at 17-18.

The Supreme Court has rejected the claim that SMCRA's mere enactment effected a taking. In *Hodel v. Indiana*, the Court concluded that the "mere enactment" of SMCRA was not an unconstitutional taking of private property. *Hodel v. Indiana*, 452 U.S. 314, 334–35 (1981). SMCRA, by its enactment, did not require a specific AVF determination as to the Otter Creek Coal property. Similarly, the mere adoption of federal regulations on a state level does not make the DEQ determination a taking. On this element, GNP's claim that the enactment of the AVF provisions in SMCRA took its property, therefore, fails to state a claim.

### 2. DEQ was not an Agent of the United States

GNP further argues that DEQ acted as an agent of the United States. It is true that the actions of state agencies may give rise to takings liability on the part of the United States if the state entity was acting as an agent of the United States. *Lion Raisins, Inc. v. United States*, 416 F.3d 1356, 1363 (Fed. Cir. 2005); *see also Hendler v. United States*, 952 F.2d 1364, 1378 (Fed. Cir. 1991). But agency requires a fiduciary relationship in which one party consents to another acting on his behalf, and that actor consents to do so. *B & G Enters., Ltd. v. United States*, 220 F.3d 1318, 1323 (Fed. Cir. 2000); *see also Fisher*, 148 Fed. Cl. at 493–94 (describing as essential element of agency principal's right to control agent's actions).

GNP's Complaint does not contain any allegations that the United States consented to DEQ acting on its behalf, nor does it contain any allegations that DEQ consented to act as the United States' agent. The complaint does not allege that the United States had the right to control DEQ's actions either. Again, critical to this case is that primacy states regulate under state law. Bragg *v. W. Va. Coal Ass'n*, 248 F.3d 275, 288-89 (4th Cir. 2001). As a primacy state, Montana enacted MSUMRA based upon its own constitutional authority. *See* Mont. Code Ann. § 82-4-202.

### 3. GNP's Complaint Fails to Plead Causation

Government action is a requirement for suit against the United States in a takings claim. "It is axiomatic that property cannot be the subject of a takings claim against the federal government unless there has been some action by the federal government." *Ciampetti v. United States*, 18 Cl. Ct. 548, 553 (1989); *see also All. of Descendants of Texas Land Grants v. United States*, 37 F.3d 1478, 1481 (Fed. Cir. 1994) ("A claimant under the Fifth Amendment must show

that *the United States, by some specific action*, took a private property interest for a public use without just compensation." (emphasis added)).

Defendant argues that there is not sufficient causation between the Montana agency's determination and federal action. Defendant claims that "GNP fails to plead that the *United States* caused any deprivation." ECF No. 8 at 20 (emphasis in original). Applying traditional tort concepts of causation, the Defendant contends that not only is there no allegation of federal involvement in the specific AVF determination, but also that GNP fails to identify any post-1977 federal action *at all*. The Court agrees.

Even so, GNP alleges that the action that caused the claimed taking of its property was DEQ's determination that an AVF was present on GNP's coal property and that coal mining operations would adversely affect farming on that AVF. ECF No. 1 at 6. Since the DEQ's AVF determinations result from Montana's adoption of federal minimum statutory requirements, GNP argues that there is no discretion on the part of regulatory agencies whether or not to approve mining. ECF No. 12 at 16. This, according to GNP, imputes federal causation, as Montana was faced with the "gun to the head" decision "to adopt those standards or have them forced upon them by the federal government." ECF No. 12 at 18–19. However, the Court declines to speculate on the intent of Montana in implementing SMCRA standards on a state level. The fact that Montana adopted these standards through required statutory procedures does not mean that the standards were adopted unwillingly.

Moreover, the establishment of minimum federal standards in the coal mining industry is not unreasonable, nor is it new. It is well within the purview of the Government to regulate (or even prohibit) state regulation of mining. "Congress could constitutionally have enacted a statute prohibiting any state regulation of surface coal mining. The Court fails to see why the Surface Mining Act should become constitutionally suspect simply because Congress chose to allow the States a regulatory role." *Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 290 (1981).

Here, there was not a specific action taken by the federal government other than the enactment of the SMCRA statute. Montana, through the enactment of the MSUMRA, accepted federal minimum requirements in mining regulation and requires an AVF determination prior to approving mining permits. *See* Mont. Code Ann. §§ 82-4-201 *et seq.*

GNP's position that the DEQ lacks discretion in their decisions is belied by the very nature of the determinations. Any research into the criteria for approving or denying the permit must necessarily be specific to the circumstances of the property. *See Mont. Env't Info. Ctr.*, 2013 WL 485652, at 5 ("Determining [criteria] for the coal mining permit application process requires technical, site-specific judgments that *cannot reasonably be described as nondiscretionary* . . . the material damage determination involves case-by-case factual findings and analysis of the proposed mining operations.") (emphasis added). DEQ's decision – based on the site-specific and individualized assessment of the Otter Creek coal property – is sufficiently discrete and removed from the federal government's action in creating these requirements that there is no direct causation that would expose the government to liability.

Furthermore, GNP cannot hold the United States liable for actions taken by a state agency in the application of state law, where the relevant federal regulatory scheme was inoperative. SMCRA gives primacy to the states, and Montana's actions illustrate that it acted as an independent regulator. DEQ's determination was based on state law, as Montana has SMCRA primacy and their law is operative in this case. While the government laid the parameters of what is acceptable in an AVF determination, Montana chose to accept them. "Congress may have provided the bait, but [Montana] decided to bite." *B&G Enters., Ltd. v. United States*, 220 F.3d 1318, 1325 (Fed. Cir. 2000) (finding that it was the state's decision "to create restrictions on the placement of tobacco vending machines, not the federal government's.").

And finally, GNP argues that state regulations are still subject to federal oversight. ECF No. 12 at 21. GNP contends that the federal government may incur takings liability if the state is acting as an agent of the United States. ECF No. 12 at 22; *see Lion Raisins, Inc. v. United States*, 416 F.3d 1356, 1363 (Fed Cir. 2005).

However, here Montana does not act as an agent of the government. A "[State's] legislature cannot be considered to have acted under federal authority. The State of [Montana] is an independent sovereign, which itself possesses the authority to enact legislation." *B & G*, 220 F.3d at 1324. "[T]he federal government's conditioning a state or locality's receipt of federal funds on the state's taking a particular action does not make that state or locality an agent of the federal government." *Id*. at 1323. A state does not operate as the agent of the government simply by having a state statute derived from a federal one.

Yet, GNP suggests that it is a fiction that a state acts as an "independent regulator" in the management of coal mining undercuts basic principles of federalism. *See* ECF No. 12 at 21. But, SMCRA *itself* gives the state primacy after adoption of these regulations. Indeed, SMCRA provides that "because of the diversity in terrain, climate, biologic, chemical, and other physical conditions in areas subject to mining operations, the *primary governmental responsibility for [regulating] surface mining . . . should rest with the States*." 30 U.S.C. § 1201 (emphasis added). Thus, when a state has SMCRA primacy, as is the case in Montana, "the state law is exclusively operative and regulates the permitting process." *Mont. Env't Info. Ctr*., 2013 WL 485652, at *4; *see also Bragg*, 248 F.3d 275, 289 (4th Cir. 2001). Here the state adopted regulations and operated coal mining within its borders, with no sign of federal involvement post-SMCRA enactment in 1977. Since GNP claims no federal action, their Complaint lacks sufficient causation and fails to state a claim under which relief may be granted under RCFC 12(b)(6).

### 4. GNP's Complaint Fails to Demonstrate a Valid Property Interest That Could Be the Subject of a Taking

Mont. Code Ann. § 27-30-101(a) provides that a nuisance is "[a]nything that is injurious to health, indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or that unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, river, bay, stream, canal, or basin . . . ." Montana courts have recognized that damage to farming interests and/or water

8

supplies may constitute a public or private nuisance.  *See Gravely Ranch v. Scherping*, 782 P.2d 371, 374 (Mont. 1989).

Defendant argues that GNP does not have a property interest that can be the subject of a taking, since Montana nuisance law prohibits "damage to water supplies and harm to farming interests." ECF No. 8 at 25.  In particular, "confiscatory regulations" are not takings if they are already restricted by the State's law of property and nuisance, as the State has "complementary power to abate nuisances that affect the public generally." *Lucas v. S. C. Coastal Council*, 505 U.S. 1003, 1029 (1992).  Furthermore, it has been held that the "government may defend against liability by claiming that the regulated activity constituted a state law nuisance." *Appolo Fuels, Inc. v. United States*, 381 F.3d 1338, 1347 (Fed. Cir. 2004) (stating that "

In response, GNP argues that the Supreme Court of Montana has expressly rejected the application of the nuisance exception to strip mining of coal.  ECF No. 12 at 28, quoting *Western Energy Co. v. Genie Land Co*., 737 P.2d 478, 483 (Mont. 1987) (the court declines to "characterize strip mining in Montana as a nuisance.").  Plaintiff further points to the policy of Montana to "provide for the orderly development of coal resources through strip or underground mining to assure the wise use of resources and prevent the failure to conserve coal." ECF No. 12 at 29; Mont. Code Ann. § 82-4-202(2)(g).

GNP, however, misses the mark.  GNP's argument that strip mining of coal is not a nuisance under state law is not the issue here.  Instead, the issue here is not whether surface mining of coal in general is a nuisance, but whether surface mining of coal in an area with an AVF such that mining would be adverse to agricultural interests is a nuisance.  In particular, Montana law provides that "[a]nything that is injurious to health, indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property . . . is a nuisance." Mont. Code Ann. § 27-30-101(1).  DEQ concluded that the proposed mining would "interrupt, discontinue, or preclude farming on" the AVF.  *See* Pl.'s Resp. at App. 1. Such activity would, therefore, be an "obstruction to the free use of property" and "interfere with the comfortable enjoyment of . . . property"; it would be a nuisance under state law.  As such, the regulated coal mining at issue here is not a property right GNP possessed.

That being said, GNP directs the Court's attention to *Whitney Benefits, Inc. v. United States*, 926 F.2d 1169, 1176 (Fed. Cir. 1991) which looked at Congress's motivation for AVFs. In doing so, the Federal Circuit advanced the idea that because Congress permitted continued surface mining of coal underlying some AVFs, Congress's position was that AVF mining was, therefore, not in itself a nuisance.  Here, Defendant is not arguing that all AVF mining is a nuisance or that GNP lacked any property right to mine any AVF regardless of its effects. Rather, in this case, the focus of the nuisance inquiry falls upon the regulated activity.  And here, unlike in *Whitney Benefits*, GNP submitted a permit application and DEQ made a specific AVF determination.  *See id.* at 1171–72.  Thus, the Court's statement in *Whitney Benefits* that "Congress was not in SMCRA abating a 'nuisance'" is not relevant to this case, because in *Whitney Benefits* the Federal Circuit was reviewing the effect of SMCRA's enactment alone, rather than a specific regulatory decision.  *See id.* at 1177.

Thus, the Court holds that the regulated coal mining here would be a nuisance under state law, and therefore the Defendant cannot be liable for a taking.

### 5.   The Allegations in GNP's Complaint Fail to State a Claim for a Taking Applying the *Penn Central* Test

*Penn Central Transportation Company v. New York City*, 438 U.S. 104 (1978) applies where a Plaintiff alleges a regulatory taking that is not a *per se* taking.  To survive a motion to dismiss under RCFC 12(b)(6), a complaint must allege facts sufficient to satisfy each of the factors set out in *Penn Central*.  These factors are: (1) the character of the state action; (2) the economic impact of the regulation; and (3) the regulation's interference with the owner's investment-backed expectations.  These factors are to be considered in terms of "the parcel as a whole."  *Id*. at 130–31.

#### a.   The Character of The State Action

Defendant argues that federal mining regulations, and the AVF regulations in particular, are in place to further the state interest in stewarding the environment and protecting farms and water treatment.  30 U.S.C. § 1260; ECF No. 8 at 25.  The Defendant provides that the protection of farming interests and water supplies inherent in SMCRA's AVF provisions is the sort of government action that does not constitute a taking, as it is taken to protect the environment and public health and safety.  *See Norman v. United States*, 63 Fed. Cl. 231, 285-26 (2004); *see also Rith Energy, Inc. v U.S.*, 270 F.3d 1347 (Fed. Cir. 2001) (With respect to the nature of the governmental action, the revocation of the permit, was an exercise of the police power directed at protecting the safety, health, and welfare of the communities.); *Agins v. Tiburon,* 447 U.S. 255,  (1980) (land use regulation does not effect a taking if it "substantially advance[s] legitimate state interests"); *Penn Central,*  438 U.S. at 127 (use restriction on property is not a taking if it is "reasonably necessary to the effectuation of a substantial government purpose.")).

In contrast, GNP argues that strip mining of coal does not create an impediment to public health and safety.  *Western Energy Co. v. Genie Land Co*., 737 P.2d 478, 483 (Mont. 1987).  GNP further asserts that however worthy the purpose is, the public's burden cannot be disproportionately placed on owners without providing just compensation.  *See Cienega Gardens v. United States*, 331 F.3d 1319, 1340 (Fed. Cir. 2003).

Those in the coal mining industry "necessarily understand" that they can expect regulation of their right to mine under a coal lease, and "[t]he likelihood of regulatory restraint is especially high with regard to possible adverse environmental effects . . . ." *Rith Energy,* 270 F.3d 1347, 1351.  Because the government has immense discretion over how and when to regulate health and safety, this type of governmental action does not require compensation for the burdens it imposes on private parties who are affected by the regulations.

#### b.   The Economic Impact of The Regulation

The economic impact must be severe to meet the second *Penn Central* factor and support a claim for regulatory taking.  The diminution in value of the land must be substantial.  The Federal Circuit has observed that no court has found a taking where there has been a less than 50% diminution in value.  *CCA Assocs. v. United States*, 667 F.3d 1239, 1246 (Fed. Cir. 2011).

Defendant argues that GNP's Complaint does not allege a severe enough impact to support a takings claim.  ECF No. 8 at 29.  Specifically, the Defendant maintains that the Supreme Court has found no takings in cases where there was a 75% and 87.5% diminution in value.  *Cienega Gardens*, 331 F.3d at 1345 (citing *Euclid v. Ambler Realty Co.*, 272 U.S. 365 (1926) and *Hadacheck v. Sebastian*, 239 U.S. 394 (1915)).

However, GNP sees this differently.  GNP contends that the economic impact is sufficiently severe, as their ability to mine is limited to 85,798,419 out of 396,431,839 tons, which are located in the "most difficult and expensive portion of the coal reserve to reach making it severely uneconomical to attempt to extract any remaining coal."  ECF No. 12 at 31-32.

Here, GNP alleges that coal reserves in the Otter Creek coal property, including the property owned by the United States and GNP, total approximately 731 million tons.  ECF No. 1 at 4.  The coal tonnage owned by GNP totals approximately 396,431,839.  ECF No. 12 at 31.  The area of DEQ's AVF determination that is unable to be mined contains only 310,633,420 tons of coal reserves owned by GNP. ECF No. 12 at 31.  Taking GNP's pleaded claims as true, by their own admission, GNP claims that 85,798,419 coal reserves (21.6%) are unaffected.  Thus, 78.4% of the coal reserves are affected by the alleged taking.  This is a severe enough impact to state a claim for regulatory taking.[3]  This percentage is over the Federal Circuit's threshold.  Although it is not the 75% and 87.5% diminution in value that the Supreme Court has recognized, the Supreme Court has not imposed on the courts a rigid rule regarding percentage of diminution of value.  But, even if the economic injury was severe, *Appolo Fuels*' analysis of the *Penn Central* factors combined the lack of investment-based expectations with the government action based in a legitimate interest in protecting health and safety taken together those facts were sufficient to overcome even severe economic injury.

### c.  The Regulation's Interference with The Owner's Investment-Backed Expectations

Defendant argues that the length of time since SMCRA has been enacted renders it implausible that GNP's investment-backed expectations were reasonably interfered with.  In contrast to the Plaintiff's time bar claim, the 1977 passage of SMCRA put mining businesses on notice that they may reasonably expect regulations in this area.  ECF No. 8 at 31.

---

[3] Plaintiff's Response to Defendant's Motion to Dismiss notes that 86% of GNP's coal is precluded from being mined, and 14% is able to be mined, but if the pleaded coal tonnages are accepted as true then 21.6% is the correct unaffected coal amount.  *See* ECF No. 12 at 32.

GNP argues that they had reasonable investment backed expectations based on projected royalties and the years and funds spent developing the Otter Creek mine. ECF No. 12 at 34. GNP pleads that "Arch Coal spent hundreds of millions of dollars in seeking to develop the Otter Creek mine." *Id*.

Here, the long, hard, and costly work that GNP and its lessee put into Otter Creek does not automatically determine that this was done in unreasonable reliance on their anticipated ability to mine. It is reasonable to assume that regulations will be enforced. It would also be reasonable for a company to wait until their mining permit application was completed before operating in reliance on that approval.

## III.    Conclusion

This Court lacks subject matter jurisdiction over matters which arise under state law. Further, GNP fails to state a claim which relief may be granted. Therefore, this Court lacks subject matter jurisdiction and must dismiss the case pursuant to RCFC 12(h)(3).[4]

Therefore, the Court hereby **GRANTS** Defendant's Motion to Dismiss under RCFC 12(b)(1) and 12(b)(6). The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/Edward J. Damich
EDWARD J. DAMICH
Senior Judge

---

[4] Plaintiff's Motion to Notify Interested Party State of Montana, filed July 5, 2022, ECF No. 41, is denied as moot in light of this opinion.